# TEXAS COURT OF APPEALS, THIRD DISTRICT, AT AUSTIN

## NO. 03-19-00212-CV

**Texas State University President Denise M. Trauth; Texas State University Assistant Vice President for Research and Federal Relations Michael Blanda; Texas State University Registrar Louis E. Jimenez, Jr.; and Texas State University Regents William F. Scott, David Montagne, Charlie Amato, Duke Austin, Garry Crain, Veronica Muzquiz Edwards, Dionicio Flores, Nicki Harle, and Alan L. Tinsley, In their Official Capacities, Appellants[1]**

v.

**K. E., Appellee**

### FROM THE 22ND DISTRICT COURT OF HAYS COUNTY
### NO. 15-0116, THE HONORABLE R. BRUCE BOYER, JUDGE PRESIDING

## O P I N I O N

Texas State University President Denise M. Trauth; Texas State University Assistant Vice President for Research and Federal Relations Michael Blanda; Texas State University Registrar Louis E. Jimenez, Jr.; and Texas State University Regents William F. Scott, David Montagne, Charlie Amato, Duke Austin, Garry Crain, Veronica Muzquiz Edwards, Dionicio Flores, Nicki Harle, and Alan L. Tinsley, who were all sued in their official capacities (collectively, the University officials), challenge the trial court's order denying their plea to the jurisdiction in which they asserted that K.E.'s claims for declaratory and injunctive relief were barred by sovereign immunity. We will affirm.

---

[1] Pursuant to Rule 7.2 of the Texas Rules of Appellate Procedure, current Texas State University Regents Duke Austin, Garry Crain, Dionicio Flores, and Nicki Harle have been automatically substituted for former Regents Donna Williams, Jaime Garza, Rossanna Salazar, and Vernon Reaser as appellants.

**BACKGROUND**

K.E. is a former student and graduate of Texas State University (the University). In May 2011, the University Board of Regents conferred on K.E. a Doctor of Philosophy (PhD) with a major in aquatic resources. K.E.'s dissertation research involved the in-field collection of leaves using a leaf gas analyzer called a LiCor instrument. K.E. collected the data in 2008 and relied on that data in completing her dissertation. After the conferral of K.E.'s degree, K.E.'s doctoral advisor raised a concern about K.E.'s 2008 data collection using the LiCor instrument and ultimately submitted a written statement to Assistant Vice President for Research and Federal Relations Michael Blanda conveying her suspicion that K.E. had falsified her research data. Blanda then informed K.E. that there would be a formal inquiry by an "Inquiry Committee" into the allegation of research misconduct. In January 2013, the Inquiry Committee issued a report recommending that the University proceed with a full investigation. In March 2014, the University's Investigative Panel concluded that K.E. had committed misconduct in research and scholarship and recommended that the University revoke the PhD degree conferred three years earlier.

K.E. appealed the Investigative Panel's findings and recommendations to the University President, Denise M. Trauth, who upheld the findings and recommendations and submitted to the Board of Regents her recommendation that K.E.'s degree be revoked. In August 2014, the Board of Regents conducted a hearing on the matter, affirmed Trauth's recommendation to revoke K.E.'s degree, and ordered Trauth to "take such actions as are reasonable and necessary" to effect the revocation. As a result, the University noted the revocation on K.E.'s transcript and asked that she return her diploma to the Registrar. Trauth also requested that K.E. cease representing herself as having received a PhD from the University.

2

In January 2015, K.E. sued the University officials complaining that the University officials' actions had violated her constitutional right to due process. K.E. amended her petition to allege that the University officials did not have the legal authority to revoke her degree. K.E. sought declaratory relief and injunctive relief seeking an order that the University officials take the actions necessary to reinstate her degree and remove any notation from the University's records that "states or suggests that [her] degree was revoked." K.E. also requested that the court order the Registrar to reinstate her degree.

The University officials filed a plea to the jurisdiction in which they asserted that K.E.'s claims against them were barred by sovereign immunity. While acknowledging that sovereign immunity is not implicated when a suit is brought against a state official in his official capacity if it seeks to enjoin the official's *ultra vires* conduct, the University officials asserted that they had the legal authority to revoke K.E.'s degree and, consequently, she had failed to allege a viable *ultra vires* claim within the court's subject-matter jurisdiction.

After a hearing, the trial court denied the University officials' plea to the jurisdiction. The University officials perfected this appeal and, in two issues, argue that the trial court erred in concluding that K.E. had alleged a viable *ultra vires* claim and denying their plea to the jurisdiction.

## DISCUSSION

In their second issue, the University officials assert that the trial court erred by denying their plea to the jurisdiction because K.E.'s claims against them are barred by sovereign immunity. Our analysis of whether K.E.'s suit is within the trial court's jurisdiction begins with her live pleadings. *See Texas Dep't of Parks & Wildlife v. Miranda*, 133 S.W.3d 217, 226 (Tex.

3

2004). The plaintiff has the initial burden of alleging facts that affirmatively demonstrate the trial court's jurisdiction to hear the cause—in this case, with respect to her claims of *ultra vires* acts, allegations of fact that would demonstrate that the University officials acted without legal authority or failed to perform a purely ministerial act. *See id.* (citing *Texas Ass'n of Bus. v. Texas Air Control Bd.*, 852 S.W.2d 440, 446 (Tex. 1993)). When, as here, the facts relevant to jurisdiction are undisputed, the court should make the jurisdictional determination as a matter of law based solely on those undisputed facts. *University of Tex. v. Poindexter*, 306 S.W.3d 798, 806 (Tex. App.—Austin 2009, no pet.) (citing *Miranda*, 133 S.W.3d at 226). Whether the plaintiff has met this burden is a question of law, which we review de novo. *Id.* We construe the pleadings liberally, taking them as true, and look to the pleader's intent. *Id*. If the pleadings do not contain sufficient facts to affirmatively demonstrate the trial court's jurisdiction but do not affirmatively demonstrate incurable defects in jurisdiction, the issue is one of pleading sufficiency, and the plaintiff should be afforded an opportunity to amend. *Miranda*, 133 S.W.3d at 226-27. If, however, the pleadings affirmatively negate the existence of jurisdiction, a plea to the jurisdiction may be granted without allowing the plaintiff an opportunity to replead. *Id.* at 227.

Sovereign immunity extends to state officials acting in their official capacity. *See City of El Paso v. Heinrich*, 284 S.W.3d 366, 369-70 (Tex. 2009). Sovereign immunity does not, however, bar claims alleging that a government actor acted *ultra vires*, or without legal authority, in carrying out his or her duties. *Houston Belt & Terminal Ry. Co. v. City of Houston*, 487 S.W.3d 154, 157-58 (Tex. 2016). To assert a valid *ultra vires* claim, the plaintiff "must not complain of a government officer's exercise of discretion, but rather must allege, and ultimately prove, that the officer acted without legal authority or failed to perform a purely ministerial act." *Heinrich*, 284 S.W.3d at 372. Conversely, if the plaintiff alleges only facts demonstrating acts

4

within the officer's legal authority and discretion, the claim seeks to control state action and is barred by sovereign immunity. *Id.*; *Creedmoor-Maha Water Supply Corp. v. Texas Comm'n on Envt'l Quality*, 307 S.W.3d 505, 516 (Tex. App.—Austin 2010, no pet).

In her live pleadings, K.E. complains of the University officials' "revocation" of her degree, asserting that such action was unauthorized and violated her constitutional right to due process. K.E. has pleaded a cognizable *ultra vires* claim if her allegations establish that the University officials exceeded the bounds of their granted legal authority by "revoking" her degree. *See Houston Belt & Terminal Ry.*, 487 S.W.3d at 158. To determine whether K.E. has asserted a valid *ultra vires* claim that invokes the district court's subject-matter jurisdiction, we construe the provisions of the relevant statutes that define the scope of the University officials' legal authority, apply them to the facts that K.E. has alleged, and ascertain whether those facts constitute acts beyond the University officials' legal authority. *See Heinrich*, 284 S.W.3d at 372-73; *Texas Dep't of Transp. v. Sunset Transp., Inc.*, 357 S.W.3d 691, 701 (Tex. App.—Austin 2011, no pet.).

Texas State University is included within the Texas State University System. *See* Tex. Educ. Code § 96.41 (providing that Texas State University is coeducational institution of higher education under management and control of Texas State University System Board of Regents). The University's authority derives from the Texas Education Code, which provides for the Texas State University System. *See id.* § 95.01-.06 (provisions governing administration of Texas State University System). Broadly, the Education Code confers on the University's Board of Regents certain general responsibilities and authority:

> (a)  The board is responsible for the general control and management of the universities in the system and may erect, equip, and repair buildings; purchase

5

libraries, furniture, apparatus, fuel, and other necessary supplies; employ and discharge presidents or principals, teachers, treasurers, and other employees; fix the salaries of the persons employed; and perform such other acts as in the judgment of the board contribute to the development of the universities in the system or the welfare of their students.

*Id.* § 95.21(a) (general responsibilities and authority of Board of Regents). Section 95.21(b) empowers the Board to carry out its responsibilities by promulgating and enforcing rules, regulations, and orders, providing:

(b) The board has authority to promulgate and enforce such rules, regulations, and orders for the operation, control, and management of the university system and its institutions as the board may deem either necessary or desirable.

*Id.* § 95.21(b).

More specifically, the Education Code authorizes the Board of Regents to determine the conditions on which students may be admitted to the University, the grades of certificates issued, the conditions for the award of certificates and diplomas, and the authority by which certificates and diplomas are signed. *Id.* § 95.24. The parties join issue as to whether these statutes, when properly construed, authorize the University to revoke a former student's degree after it has been conferred.

Because statutory construction is at the heart of the dispute, we begin our analysis by reviewing the pertinent statutory-construction principles. *First Am. Title Ins. v. Combs*, 258 S.W.3d 627, 632 (Tex. 2008). Statutory construction presents a question of law that we review de novo. *Id.* We discern legislative intent primarily from the statute's language because it is "'the truest manifestation' of what lawmakers intended . . . ." *Id.* (quoting *Alex Sheshunoff Mgmt. Servs., L.P. v. Johnson*, 209 S.W.3d 644, 651-52 (Tex. 2006)). If statutory language is unambiguous, we will interpret and apply the statute according to its plain meaning unless a

6

different meaning is apparent from the context or the plain meaning leads to absurd results. *In re Ford Motor Co.*, 442 S.W.3d 265, 280 (Tex. 2014) (orig. proceeding). In determining a statute's meaning, we construe the statute as a whole rather than construing specific provisions in isolation. *Id.* We look to the entire act in determining the legislature's intent regarding specific provisions. *Railroad Comm'n v. Texas Citizens for a Safe Future & Clean Water*, 336 S.W.3d 619, 628 (Tex. 2011). Undefined terms are afforded their ordinary meaning unless a different or more precise definition is apparent from the context of the statute, *see* Tex. Gov't Code § 311.011(a); *TGS-NOPEC Geophysical Co. v. Combs*, 340 S.W.3d 432, 439 (Tex. 2011), because we cannot give an undefined term a meaning that is disharmonious or inconsistent with other provisions in the statute, *see Texas Dep't of Transp. v. Needham*, 82 S.W.3d 314, 318 (Tex. 2002).

With these principles in mind, we determine whether the relevant statutory provisions authorize the University officials to revoke a degree after it has been conferred on a former student. Notably, the specific statutory provision dealing with diplomas and certificates states that the University officials may determine "the conditions for the award of certificates and diplomas" but includes nothing that could reasonably be construed as an express grant of authority to strip a former student of a diploma or degree after it has been conferred. The University officials urge, however, that such authority is found in the Rules and Regulations that the University's Board of Regents created, one of which purports to authorize decree revocation.[2] The University officials may not, however, promulgate rules in excess of or

---

[2] The rule created by the University's Board of Regents provides that when the Board "determines that a degree, certificate, diploma, or admission to the institution and/or the academic program was obtained through fraud, mistake, or academic dishonesty, the Board may

inconsistent with the relevant statutory provisions. *See Harlingen Family Dentistry, P.C. v. Texas Health & Human Servs. Comm'n*, 452 S.W.3d 479, 481-82 (Tex. App.—Austin 2014, pet. dism'd). The University's rules must comport with its authorizing statute. *Id.* A state agency has only the authority expressly provided by statute or necessarily implied to carry out the express powers the Legislature has given it. *See Public Util. Comm'n v. City Pub. Serv. Bd.*, 53 S.W.3d 310, 315 (Tex. 2001). The University officials cannot point to rules promulgated by the Board itself as the source of an authority that is not either expressly provided by the Education Code or necessarily implied in order to carry out an express power given by the Legislature.

The University officials assert that the rule authorizing degree revocation is consistent with the legislative grant of authority found in subsection 95.21(b) to promulgate "such rules, regulations, and orders for the operation, control, and management of the university system and its institutions as the board may deem either necessary or desirable." *See* Tex. Educ. Code § 95.21(b). The grant of authority to promulgate rules found in subsection 95.21(b) must, however, be read in conjunction with and with reference to the contours of the legislative grant of authority found in the preceding subsection 95.21(a). *See id.* § 95.21(a). That subsection outlines the *general* responsibilities and authority of the Board with respect to the "general control and management of the universities in the system" and provides examples of what such control and management might entail, including erecting and repairing buildings, purchasing furniture, hiring and firing teachers and other employees, and fixing their salaries. Thus, properly construed, section 95.21 is concerned with the day to day operations of the university and

---

revoke the degree, certificate, or diploma, provided the Component has afforded the degree, certificate, or diploma recipient due process of law."

8

the management of its personnel. While the phrases "general control and management of the universities in the system" and "contribute to the development of the universities" are purposefully broad, their breadth is inherently limited to interests that are material to the purpose of section 95.21, which is to authorize the Board of Regents to manage the operations and development of the university system. To construe the term without the limitations of the context in which it is found would result in a grant of authority so broad as to render unnecessary any further statutory grants of authority. Such a construction of section 95.21 would render superfluous section 95.24, the statute that specifically addresses diplomas, as well as several other provisions found in subchapter B. *See, e.g.*, *id.* §§ 95.28 (authorizing Board to disburse funds appropriated by Legislature); .31 (authorizing Board to acquire land); .34 (permitting Board to accept donations, gifts, grants, and endowments). We must reject a construction of a statute that renders some statutory language unnecessary when another construction is possible. *See City of San Antonio v. City of Boerne*, 111 S.W.3d 22, 20 (Tex. 2003) (rejecting construction that would render some statutory language unnecessary and citing *Spence v. Fenchler*, 180 S.W. 597, 601 (Tex. 1915), for proposition that "[i]t is an elementary rule of construction that, when possible to do so, effect must be given to every sentence, clause, and word of a statute so that no part thereof be rendered superfluous or inoperative"). We must, instead, read the statute contextually and consider the relevant language in the context of the statute as a whole, rather than as isolated provisions, and endeavor to give effect to every word, clause, and sentence, so that none of the language is rendered superfluous. *See Crosstex Energy Servs., L.P. v. Pro Plus, Inc.*, 430 S.W.3d 384, 390 (Tex. 2014); *In re Office of Attorney Gen.*, 422 S.W.3d 623, 629 (Tex. 2013); *TGS-NOPEC Geophysical*, 340 S.W.3d at 439. We conclude that section 95.21(a) does not empower the University officials to revoke a degree the University had previously conferred

9

on a former student.  Correlatively, the authority to promulgate and enforce rules contained in section 95.21(b) is not so broad as to permit the University officials to create a rule that purports to authorize revocation of a degree conferred on a former student.

The University officials also argue that, even if the Legislature did not expressly authorize revocation of a degree after it has been conferred, such authority may be implied from Texas Education Code section 95.24, which provides that the University officials may "determine [] the conditions for the award of certificates and diplomas, and the authority by which certificates and diplomas are signed."  Tex. Educ. Code § 95.24.  The University officials assert that the authority to revoke a diploma is a "necessary corollary" to a university's right to issue the diploma.

An agency's implied powers are limited to those "necessary to carry out the express responsibilities given to it by the Legislature."  *Public Util. Comm'n v. City Pub. Serv. Bd.*, 53 S.W.3d 310, 315 (Tex. 2001) (citing *Public Util. Comm'n v. GTE-Sw., Inc.*, 901 S.W.2d 401, 407 (Tex. 1995)).  The law prohibits agencies from exercising what is effectively a new power, or a power contradictory to the statute, based merely on a claim that the power is expedient for the agency's purposes.  *Id.* (citing *GTE-Southwest*, 901 S.W.2d at 407).  The test is not whether the power is a necessary "corollary" but, rather, whether the power is necessary for the University to perform a function or duty that the legislature has required of it in *express* terms.  The critical question to be answered is whether the power must be implied in order to allow the University officials to effectively carry out the functions that have been specifically assigned to them.  *See Texas Mun. Power Agency v. Public Util. Comm'n*, 253 S.W.3d 184, 192-93 (Tex. 2007) (noting that "agency's powers are limited" to those "expressly conferred by the Legislature" and those implied that are reasonably necessary to carry out agency's express

10

responsibilities); *City Pub. Serv. Bd. v. Public Util. Comm'n*, 9 S.W.3d 868, 873-74 (Tex. App.—Austin 2000) (explaining that it is "axiomatic that" agency "has no inherent power, but only such powers as are delegated to it by the legislature in clear and *express* statutory language, together with any implied power that may be necessary . . . to perform a function or duty that the legislature has required of the agency in *express* terms" and that agency powers "must be construed narrowly when they are claimed to authorize governmental interference with established or traditional property rights"), *aff'd*, 53 S.W.3d 310, 312, 325 (Tex. 2001). May we imply the power to revoke a degree on the ground of necessity to accomplish the University's express power to award certificates and diplomas? We may not make such an implication unless the grant of authority to award certificates and diplomas will itself be *defeated* absent an attendant authority to revoke the certificate or diploma at a later date. *See GTE Sw., Inc. v. Public Util. Comm'n*, 10 S.W.3d 7, 12-13 (Tex. App.—Austin 1999, no pet.) (providing that grants of power to agencies must be construed narrowly when claimed to interfere with property rights and that power may be implied only if express powers could be defeated in absence of implied powers). Even the University officials do not contend that that is the case. Moreover, familiar rules of statutory construction reject such an implication. Statutory grants of power to administrative agencies must be construed narrowly when they are claimed to authorize governmental interference with established or traditional property rights. *See* 3 Norman J. Singer & J.D. Shambie Singer, *Statutes & Statutory Construction* § 65:2 (7th ed. 2008). This is particularly true when the power claimed to be implied necessarily raises, as it does here, substantial constitutional questions regarding due process. *See Rust v. Sullivan*, 500 U.S. 173, 190-91 (1991).

11

The University officials point to courts in other jurisdictions that have found that their state's universities have the implied right to revoke a degree "irrespective of statutory language," and maintains that these other cases are "persuasive." This Court is not, however, tasked with surveying other jurisdictions and considering how courts in other states have resolved the question of their institutions' authority to revoke conferred degrees. Rather, our job is to discern the Legislature's intent as expressed in the plain language of the Texas Education Code. That cases from other jurisdictions are inapposite to our analysis is highlighted by jurisprudential differences in interpreting agency authority. For example, the University officials rely heavily on *Waliga v. Board of Trustees of Kent State University*, 488 N.E.2d 850 (Ohio 1986), an Ohio Supreme Court case holding that Kent State University had the "authority and power" to revoke degrees. The court stated:

> Any action which is necessary for the proper maintenance and successful operation of a state university is authorized, *unless it is prohibited* by statute. In the event that a degree is procured through fraud, or a degree is awarded erroneously, it is certainly within the implied authority of the university to revoke it. A power of a state agency may be fairly implied from an express power where it is *reasonably related* to the duties of the agency.

*Waliga*, 488 N.E.2d at 851 (citations omitted) (emphases added). While an Ohio court apparently may imply any powers "reasonably related" to an agency's duties, we are constrained to imply only those powers necessary for the performance of powers expressly authorized. *See Texas Mun. Power Agency*, 253 S.W.3d at 192-93; *cf. Hand v. Matchett*, 957 F.2d 791, 795-96 (10th Cir. 1992) (applying New Mexico law and relying on *Waliga* to conclude that ability to revoke degrees is "necessary corollary" to power to confer those degrees).[3] Cases from other

---

[3] While the University officials also cite to *Gati v. University of Pittsburgh of Commonwealth System of Higher Education*, 91 A.3d 723 (Pa. 2014), as persuasive authority, we

jurisdictions interpreting different statutes and employing different rules of statutory construction are not relevant to our analysis.[4]

K.E.'s pleadings have alleged an *ultra vires* claim against the University officials, specifically, that they acted without legal authority when they purported to revoke her degree. Thus, her claims do not implicate sovereign immunity, and the trial court properly concluded that it had subject-matter jurisdiction over her claim. It was not error for the trial court to deny the University officials' plea to the jurisdiction. We overrule the University officials' second issue.

In their first issue, the University officials argue that the trial court lacked subject-matter jurisdiction over K.E.'s *ultra vires* claim because, in their view, K.E. seeks only retrospective relief. An otherwise proper *ultra vires* claim can also independently implicate the sovereign's immunity to the extent it seeks relief that goes beyond prospective injunctive or declaratory relief restraining the government's *ultra vires* conduct, such as through claims that would establish a right to retrospective monetary relief from the government principal, impose

---

note that the majority did not decide the issue of degree revocation but suggested that such relief might be sought in connection with litigation on the merits concerning the former student's entitlement to permanent injunctive relief. *Gati*, 91 A.3d at 735 n.1 (Wecht, J., concurring). *But see Goodreau v. Rector & Visitors of Univ. of Va.*, 116 F. Supp. 2d 694, 703 (W.D. Va. 2000) (citing *Waliga* and concluding that power to revoke degree must be implied because, in court's view, it is reasonably necessary to effectuate power to confer degrees and regulate student discipline).

[4] The University officials also rely on *Crook v. Baker*, 813 F.2d 88 (6th Cir. 1987), which is analytically distinguishable. In that case, the court noted that Michigan is "one of the few states to give independent constitutional status to its universities" and the Michigan constitution provides that "the University is a separate constitutional 'body corporate known as the Regents of the University of Michigan' which Regents have 'general supervision' of the University." Based on that unique status, the court held that the University of Michigan has the authority to revoke degrees in the absence of contraindicative constitutional, statutory, or case law. In Texas, however, the opposite is the case—as an agency of the State, the University officials have only the powers expressly granted by the Legislature along with those powers that may properly be implied.

13

liability upon or interfere with the government's rights under a contract, or otherwise control state action. *See Heinrich*, 284 S.W.3d at 373-76 (otherwise proper *ultra vires* claims implicate immunity to extent remedy has effect of retrospective monetary relief); *Texas Nat. Res. Conservation Comm'n v. IT-Davy*, 74 S.W.3d 849, 855-56 (Tex. 2002) (contrasting permissible *ultra vires* claims with "suits against state officials seeking to establish a contract's validity, to enforce performance under a contract, or to impose contractual liabilities," which "are suits against the State . . . because [they] attempt to control state action by imposing liability on the State"); *see also Texas Parks & Wildlife Dep't v. Sawyer Tr.*, 354 S.W.3d 384, 388 (Tex. 2011) (observing that "sovereign immunity will bar an otherwise proper [*ultra vires*] claim that has the effect of establishing a right to relief against the State for which the Legislature has not waived sovereign immunity" (citing *City of Houston v. Williams*, 216 S.W.3d 827, 838-39 (Tex. 2007) (per curiam))); *City of Austin v. Utility Assocs., Inc.*, 517 S.W.3d 300, 311-13 (Tex. App.—Austin 2017, pet. denied) (otherwise proper *ultra vires* claim would implicate governmental immunity to extent remedy would "undo" previously executed government contract, invalidate already-executed contract, reopen previously concluded procurement process, and compel state to re-award contract to different party). By contrast, an otherwise proper *ultra vires* claim does not implicate sovereign immunity when the claimant seeks prospective relief, such as to recover possession of property unlawfully claimed by a state official, *Sawyer Tr.*, 354 S.W.3d at 393, or to prospectively enjoin a lease, *Chambers-Liberty Counties Navigation Dist. v. State*, 575 S.W.3d 339, 354-55 (Tex. 2019) (immunity did not bar *ultra vires* claim to prospectively enjoin lease whose terms exceeded statutory authority of state signatory).

In the present case, K.E. sought declarations that the University officials' conduct was *ultra vires* and in violation of her constitutional right to due process. K.E. requested that the

14

court order the University officials to "reinstate [her] degree" and "remove any notation that states or suggests [her] degree was revoked." K.E. also requested that the court order the University's Registrar to "remove any notation that states or suggests Plaintiff's degree was revoked; and [] order the Registrar to reinstate her degree." This requested relief is prospective injunctive and declaratory relief that does not go beyond restraining the University officials' *ultra vires* conduct of revoking her degree and, consequently, does not implicate sovereign immunity by seeking to control state action. *See e.g.*, *Chambers-Liberty Counties Navigation Dist.*, 575 S.W.3d at 354-55 (plaintiff entitled to prospective relief seeking to invalidate and enjoin lease that exceeded authority of state signatory). We overrule the University officials' first issue.

## CONCLUSION

We conclude that K.E. has alleged facts supporting a viable *ultra vires* claim within the trial court's subject-matter jurisdiction. Accordingly, we affirm the trial court's order denying the University officials' plea to the jurisdiction.

_____

Thomas J. Baker, Justice

Before Justices Goodwin, Baker, and Kelly
  Concurring and Dissenting Opinion by Justice Kelly

Affirmed

Filed: September 4, 2020

15